IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARTHA C. MILLER, et al.          :
                                   :
   v.                              :           Civil No. CCB-05-3025
                                   :
MANDRIN HOMES, LTD, et al.         :
                                   :

**MEMORANDUM**

Plaintiffs Martha and Jeffrey Miller and their minor children, Amanda, Brenda, and Juan David Miller claim damages in a case arising out of the purchase of the Millers' home in Centreville, Maryland.[1] The Millers allege that the defendants exposed them to contaminated land and failed to disclose material facts about the property in violation of the federal Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601, *et seq.* ("CERCLA"), Maryland Commercial Law, Md. Comm. Law § 13-301, and Maryland common law. Now pending is the defendants Mandrin Homes, LTD ("Mandrin Homes"), Edward Kennedy, and James Mandrin's motion for summary judgment on all counts, joined by defendant Champion Realty ("Champion"). The parties have fully briefed the motion and no hearing is necessary. *See* Local Rule 105.6. For the reasons that follow, I will grant the defendants' motion for summary judgment.

**ANALYSIS**

The Millers allege that they bought a tract of land ("Lot 17") in Centreville, Maryland in January 2003 from defendant Mandrin Homes. (Compl. at ¶ 13.) Defendant Champion served

---

[1] The claims of the minor plaintiffs were voluntarily dismissed without prejudice on February 22, 2007.

1

as the Millers' agent in the purchase of the property from Mandrin Homes.  (*Id.* at ¶ 5.)  The Millers allege that the defendants knew, or should have known, that prior to the Millers' acquisition of Lot 17, the property was part of a solid and hazardous waste dump.  (*Id.* at ¶ 17.) The Millers further claim that the "Mandrin Defendants caused the release, discharge, and disposal of hazardous substances on and into Lot 17, and the groundwater percolating through Lot 17, by grading the land and disturbing the groundwater in and around the Callahan Tract and Lot 17..."  (*Id.* at ¶ 9.)

After taking possession of the property, the Millers claim they began to notice problems with the property.  In particular, the Millers noticed a punctured pipe in the Mandrin Homes basement, and an odor and yellow stain in the basement. (*Id.* at ¶ 13.)  Additionally, the Millers claim they worried about mold and mildew in their house.  As a result, the Millers suffered medical problems, including severe diarrhea, vomiting, abdominal cramping, dizziness, lethargy, and irritability, though they have produced no medical records or other evidence to substantiate those claims.[2]  Over the course of 2003, the Millers complained about their problems to the defendants, and Mandrin Homes investigated and sent some subcontractors to repair the house. The Millers did not have all of the repairs done to their satisfaction, and called third-parties to conduct environmental and structural investigations and studies of the house. Mandrin Homes and the Millers' home insurance company, Erie Insurance Group, also performed inspections of the house in 2003.  (*See* Def.'s Mem. at Exs. 6, 12, 14, 16, 18, 23.)

The results of the testing were mixed.  Sussex Environmental tested the house for mold

---

[2] In their complaint, the Millers state that they "did not then [in November 2003], and do not now, have the economic resources to determine whether their exposure has caused or will, in time, cause permanent injury to them or to the Miller children."  (*Id.* at ¶ 16.)

2

and sewage bacteria in May 2003 and found that "[a]ir samples obtained in the house were comparable to that obtained outdoors", "[t]here were no significant concentrations of potentially allergenic microbial spores found in the home that were not found outdoors at higher concentrations", and "[t]he results of the sample analysis revealed sewer contamination less than the limit of detection." (*Id.* at Ex. 6.) Chesapeake Engineering and Design inspected the house in July 2003, and found that the "airborne mold spore levels inside the residence were less than 50% of the outdoor air", the levels of mold colony forming units were consistent with a misplaced piece of fruit or bread, the waste pipe in the basement showed no signs of leakage, and no visible damage to the building materials in the vicinity of the sewer leak was present." (*Id.* at Ex. 14.) Also in July 2003, Brook Environmental and Engineering Corp. performed mold testing and, while they did not provide a report, the statistical analysis was later interpreted to indicate no problems. (*Id.* at Ex. 16, Brook Environmental data; *Id.* at Ex. 17, Building Dynamics summary report). In contrast to the previous three studies, an undated report prepared by the East Coast Building Consultants, which attached no accompanying data, states that the carpets and HVAC system in the house should be properly sanitized and that the "family illness has all the characteristics of mold & mildew and bacteria allergenic reactions..." (*Id.* at Ex. 18.) In September 2003, ETI Environmental Laboratory ("ETI") analyzed a report of an HVAC filter found in the house, and found that "[t]he bacterial and fungi counts are high for a filter that is present in an HVAC system after cleanup of this home. However, there are no highly toxic microbiological agents ... present." (*Id.* at Ex. 19.)

Testing of the house continued after the Millers vacated the house in November 2003. On June 2004, the Washington Suburban Sanitary Commission ("WSCC") analyzed water

samples in the house that were later interpreted to be within normal background range for organics. (*Id.* at Ex. 20, WSCC report; *Id.* at Ex. 17, Building Dyamics summary report.) In July 2004, the Environmental, Health, Safety and Quality Management Services, Inc. analyzed samples from various rooms in the Millers' house, finding that there were trace amount of volatile organics in the house that were consistent with a normal background range of chemicals. (*Id.* at Ex. 21.) Building Dynamics performed another inspection of the home on January 5, 2006, and summarized the findings of the previous inspections. (*Id.* at Ex. 17, 22.) The report stated that, while a basement drain pipe puncture occurred during construction, the leak was low in volume, and "several rounds of environmental testing failed to establish elevated contaminate levels in the house as a whole or relatively higher concentrations in the basement where the drain pipe leaked. ... No health hazards were observed or reported." (*Id.* at Ex. 17.) In a 2006 report, SIE Associates also performed a structural analysis of the house, finding that "the defects in the primary structure of the Millers' home are limited to cracks in the plain concrete basement walls" and concluding that "there are no technical reasons to preclude the house from being occupied." (*Id.* at Ex. 22.)

In November 2005, the Millers filed this complaint against the defendants alleging: violations of CERCLA (Count 1), breach of implied warranties (Count 2), unfair competition and deceptive acts under Maryland Commercial Law (Counts 3, 4, and 5), deceit (count 6), and negligent misrepresentation (count 7). In particular, the Millers claim that the defendants failed to disclose that the house was built on or near a waste dump, built a sub-standard house in breach of the implied warranty of habitability, and caused the release of hazardous substances into the house, constituting both a structural defect and a CERCLA violation, which caused the Millers'

4

medical damages.

The Millers contacted an expert in the field of hydrogeology, Lorne Everett, Ph.D to examine the environmental conditions around the house. (Pl.'s Opp. Mem. at Ex. 1, Everett Decl. at ¶ 21.) Dr. Everett did not visit the house or take air or water samples, but did analyze photographs and the environmental and structural studies performed on the premises by the various third-parties. According to Dr. Everett, the photographs revealed that there was some indication of significant land disturbance between 1952 and 1957 in the area east of the subject property and the "observed pattern of land disturbance is consistent with a dump or landfill." Dr. Everett also noted that the subject property appeared to be undergoing revegetation in the mid-1980s and "may not have been an active dumping ground after this time." (*Id.* at ¶ 22.) Further, the immediate presence of some marsh land to the west of the property "would indicate a shallow depth to groundwater, exacerbating the human health risk associated with contaminated water and vapors intruding into the building." (*Id.*) In Everett's opinion, "the detection of volatile organic compounds (VOCs) and the semivolatile compound, phenol, in water from the sump at [the property] is indicative of groundwater contamination under the property." (*Id.* at ¶ 23.) Dr. Everett did not declare that the house was contaminated or that such contamination caused any of the Millers' injuries.

The scheduling order entered in this case required, *inter alia*, that the plaintiffs provide their Rule 26(a)(2) expert disclosures on November 3, 2006. On October 10, 2006, plaintiffs filed the above-discussed "Declaration" by Dr. Everett, but did not formally disclose him as an expert. The Millers filed a motion to modify the scheduling order on November 3, requesting more time to designate experts. That motion was denied on November 28, 2006. In response to

the denial of their motion, the Millers did not disclose any experts, but filed a "Rebuttal Affidavit" by Dr. Everett on December 18, which was a response to an Affidavit submitted by the defendants' expert Jack Snyder. In addition to filing a motion for summary judgment on all counts, the defendants additionally seek to preclude Dr. Everett from testifying at trial because the Millers did not properly designate him as an expert. On January 29, 2007, the Millers filed a motion asking for further time to complete discovery.

For the reasons that follow, I will deny the Millers' motion for further time for discovery, grant the defendants' motion for summary judgment, and close this case. The Millers have provided no evidence establishing key elements of their claims. On the record before me, there are no genuine issues of material fact as to any of the Millers' causes of action.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

When the party opposing summary judgment "has not had the opportunity to discover information that is essential to his opposition," *Anderson*, 477 U.S. at 250, n.5, he may request additional time pursuant to Fed. R. Civ. P. 56(f). Such a request must be supported by "an affidavit ... that particularly specifies legitimate needs for further discovery." *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995). A convincing Rule 56(f) affidavit contains specific and detailed information about the proposed discovery that links it to the elements necessary for an effective opposition. *See, e.g., Fairclough v. Bd. of County Comm'rs of St. Mary's County, Md.*, 244 F. Supp. 2d 581, 586 (D. Md. 2003) (granting time for discovery based upon affidavit identifying specific items essential to non-movant's ability to oppose summary judgment).

Here, the Millers are essentially making a Rule 56(f) motion asking for more time to conduct discovery. A similar motion was made by the Millers to modify the discovery schedule in November 2006 to extend time for discovery. I denied that motion on November 28, finding

7

that the Millers had shown no good cause for the extension of time. I will similarly deny the current motion. The Millers have provided no reasonable explanation for why further time is needed to conduct discovery or why they were unable to comply with the court's scheduling order; the Millers have similarly provided the court no assurances that discovery would be completed in the additional time requested. The Millers state that depositions of the defendants are "likely" to result in the identification of additional witnesses, but neither explain why additional witnesses are likely to be identified, nor why they have waited until the end of discovery to conduct the depositions of the defendants when the defendants have been available for deposition for most of 2006. (Pl.'s Mem. at ¶ 3.) The Millers additionally state that they recently discovered that certain third-party mortgage companies "have or may have knowledge of fresh reports," but again do not explain why this knowledge recently became available, given that the Millers bought the property four years ago, or what leads the Millers to believe that the third-party reports will come to a different conclusion than the almost dozen environmental and structural studies that were conducted on the property. *See, e.g., Nguyen*, 44 F.3d at 242 ("Vague assertions" that more discovery is needed is insufficient). The Millers were on notice of the scheduling order set forth in July 2006, and had adequate time to conduct discovery.

      Without additional evidence, there is no genuine issue of material fact in the record before me. The defendants argue that the Millers cannot prove that a landfill existed near their property, that hazardous materials were released on to the property, or that any release of these hazardous materials caused any of the Millers' injuries. The defendants submit that the court

should disregard the opinion submitted by plaintiff's sole expert, Dr. Everett, as speculative.[3]  I

agree with defendants' argument that Dr. Everett's testimony is insufficient to establish a *prima*

*facie* case on any of the Millers' causes of action.

The standard for the admissibility of scientific knowledge is set forth in Rule 702 of the

Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an expert
> by knowledge, skill, experience, training, or education, may testify thereto in the form of
> an opinion or otherwise, if 1) the testimony is based upon sufficient facts or data, 2) the
> testimony is the product of reliable principles and methods, and 3) the witness has
> applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals*, *Inc.*, the Supreme Court held

that a district court should determine whether an expert's testimony's underlying reasoning or

methodology is scientifically valid and properly can be applied to the facts at issue.  509 U.S.

579 (1993); *see Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769, 772-73 (D. Md. 2002).

I will disregard's Dr. Everett's opinions in this case because they are speculative.  While

Dr. Everett did review photographs and the environmental reports performed by others, he did

not undertake any first-hand investigation of the property and did not come to any firm

conclusions about the property in his Declaration.  For instance, Dr. Everett based his opinion of

the Miller property in part on the premise that a landfill or waste dump existed east of the

property, but Dr. Everett identifies no evidence in support of that premise, opining only that the

---

[3] The defendants also filed a motion to exclude Dr. Everett's trial testimony, arguing the Millers failed to properly designate him as an expert under the Federal Rules of Civil Procedure. I will assume without deciding that the delay in designating Dr. Everett should not in itself preclude his testimony.

aerial photographs are "*consistent* with a dump or landfill." (Pl.'s Opp. Mem. at Ex. 1, Everett Decl. at ¶ 22) (emphasis added). While the photographs may be "consistent" with a landfill, Dr. Everett did not declare, to a reasonable degree of scientific certainty, that the area *was* a landfill in the past. His opinion, accordingly, would not be sufficient for a jury to determine whether the area was, in fact, a landfill. *See Daubert*, 509 U.S. at 590 (conjecture, hypothesis, 'subjective belief, or unsupported speculation' are impermissible bases for expert opinion and must be discarded).

Dr. Everett's opinion about whether there was groundwater contamination in the property is similarly speculative. Dr. Everett declared that "the immediate presence of marsh land would *indicate* a shallow depth to groundwater, exacerbating the human health risk associated with contaminated water and vapors intruding into the building" and that the "detection of volatile organic compounds (VOCs) and the semivolatile compound, phenol, in water from the sump at 127 Cypress Street is *indicative* of groundwater contamination under the property." (Pl.'s Opp. Mem. at Ex. 1, Everett Decl. at ¶ 22-23) (emphasis added). Everett further added that "[w]ater that accumulates in a residential sump is *likely to be* - in part or in whole - an accumulation of shallow groundwater" and "[t]he infiltration of volatile organic vapors from contaminated groundwater into overlying structures is an acknowledged migration pathway by which people *may* become exposed to toxic chemicals." (*Id.* at ¶ ¶ 24-25) (emphasis added).Despite his review of the previous studies, he was unable to conclude that the groundwater was in fact contaminated and that such contamination in fact exposed the Millers to toxic chemicals. Again, such an opinion is not sufficient to permit a jury to conclude that the defendants caused any harm to the

plaintiffs.[4]

An evaluation of the studies also does not indicate a genuine dispute of material fact. One report, prepared by East Coast Building Consultants, stated that the family illness had the characteristics of mold and mildew reactions, though the report had no accompanying data. Nor did that report indicate who prepared it, what qualifications the preparers had, and how they came to their conclusions. The Millers have designated no expert from East Coast Building Consultants. The balance of the other studies indicated that the levels of bacteria and mold inside the house were comparable to or lower than the levels in the outside, ambient air. In 2006, Building Dynamics undertook to summarize all of the previous environmental studies and concluded that "several rounds of environmental testing failed to establish elevated contaminate levels in the house as a whole or relatively higher concentrations in the basement where the drain pipe leaked. ... No health hazards were observed or reported." A 2006 structural report, prepared by SIE Associates, found no serious problems in the house and found the house safe for habitation. The Millers have not produced evidence to establish a genuine issue of material fact as to whether the house was contaminated by toxins or was structurally unsound.

As the Millers have not offered scientifically valid, relevant, and admissible evidence relating to the existence of a landfill, whether toxins were released into the house, and whether the house was structurally unsound, the defendants are entitled to summary judgment on all counts.

---

[4] Further, the Millers have produced no evidence that any possible exposure to chemicals caused the Millers' injuries. Dr. Everett is not a medical doctor nor otherwise qualified to testify to medical causation, and the plaintiffs have designated no other expert.

A separate order follows.

  February 28, 2007                                               /s/            
Date                                                              Catherine C. Blake
                                                                       United States District Judge